MEEMIC INSURANCE COMPANY, as
subrogee of Gary and Candace Keinath,

       Plaintiff,                       Case No. 09-10155

v.                                   Hon. Nancy G. Edmunds

HEWLETT-PACKARD COMPANY,

       Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [18]

This dispute comes before the Court on Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, Defendant's motion is GRANTED.

**I.  Facts**

Plaintiff Meemic Insurance Company filed suit against Defendant Hewlett-Packard Company alleging claims of "Negligence / Products Liability / Breach of Implied Warranty" arising out of a house fire that occurred on January 7, 2008 in Metamora, Michigan. Plaintiff insured the home and filed this subrogation action in an attempt to recoup monies paid to cover the loss it sustained. Plaintiff's claims are based on its assertion that the fire started due to an unknown defect in the AC power adapter for a printer manufactured by Defendant.

**A.  Hewlett-Packard Printer and its AC Power Adapter**

Plaintiff's insureds, Gary and Candace Keinath, purchased a Hewlett-Packard printer, Model No. C8970A, with an AC power adapter,[1] Model No. 097-2105, in August 2007. (Candace Keinath Dep., Def.'s Mot., Ex. A at 23.) Candace used the printer for at-home projects and went through approximately one ream of paper every six to eight weeks. (*Id.* at 24-25.) The printer was located on an oak roll-top desk in their living room. (*Id.* at 26, 32.) The printer was connected to the AC power adapter which, along with the computer desktop and monitor, was plugged into a power strip/surge protector. (Gary Keinath Dep., Def.'s Mot., Ex. B at 17-18.) The power strip was plugged into an outlet in the living room near the desk. (Candace Keinath Dep., Def.'s Mot., Ex. A at 32.)

The Keinaths never experienced any issues with the printer. (Candace Keinath Dep., Def.'s Mot., Ex. A at 30; Gary Keinath Dep., Def.'s Mot., Ex. B at 17.) They never smelled or viewed anything that would indicated overheating or burning from the printer or the AC power adapter. (Candace Keinath Dep., Def.'s Mot., Ex. A at 30; Gary Keinath Dep., Def.'s Mot., Ex. B at 20-22.) And, neither the printer nor the AC power adapter was ever noticeably warm to the touch.[2] (Candace Keinath Dep., Def.'s Mot., Ex. A at 30; Gary Keinath Dep., Def.'s Mot., Ex. B at 20.)

---

[1] "The HP model 097-2105 AC adapter converts 120 Vac to 32 Vdc power for printer operation. The adapter is housed in a rectangular plastic enclosure ... The adapter uses the general principle known as an off-the-line switcher. It converts the incoming 120 Vac to DC then switches the DC at high frequency through a transformer to produce low voltage AC and the [sic] converts that AC to DC. This scheme is in worldwide use in consumer electronics in such items as computer power supplies, battery chargers and AC adapters for notebook computers." (Def.'s Mot., Ex. D. at 2.)

[2] Specifically, Gary testified that—on two separate occasions—he physically touched the AC power adapter and it was not warm. (Gary Keinath Dep., Def.'s Mot., Ex. B at 20.)

The printer was last used by Candace approximately 4 to 7 days prior to the fire. (Candace Keinath Dep., Def.'s Mot., Ex. A at 53.) After she was done using the printer, she turned it off and never turned it on again. (*Id.*) There is no record of anyone using the printer after that time.

### B. Keinath's Home Fire

On January 7, 2008, Candace came home from work to find her house on fire. (Candace Keinath Dep., Def.'s Mot., Ex. A at 57-58.) The Metamora Township Fire Department responded to Candace's 911 call and extinguished the fire. The fire department reported that "[t]he fire was contained to the living room, kitchen, and basement area." (Def.'s Mot., Ex. C at 2.)

> The fire appeared to start along the South wall of the house. Located in the South end of the house is the kitchen and living room. Separating the two rooms is a half wall. On the East side of the half wall is the kitchen and on the West side of the wall is the living room. The fire originated in the area of where the half wall meets the South wall of the house. The fire started down low around floor level, possible [sic] in one of the walls. The fire then burnt [sic] up the South wall. On the South wall I seen were [sic] the dry wall and 2x4 studs had been burnt up. The half wall had burnt up about 2 feet out from the South wall.
>
> ... On the living room side of the half wall there were two electrical out lets. The one to the South had been damaged by fire, however the one to the North was not damaged by fire.
>
> Along the South wall was a computer desk. On this desk was a computer, monitor, and a printer. All three of these items were plugged into a power strip. The power strip was plugged into an out let that was behind the computer desk. I later found the power strip and it was still plugged into the out let. The power strip had minor damage from the fire. The power strip was found laying on the floor along the South wall about 3 feet West of the area of origin. Also along the South wall in the area of origin was what appeared to be a cable and phone box.

(Def.'s Mot., Ex. C at 2.) When the fire department made contact with Candace, she informed them that, after she left for work, her daughter was on the computer and most likely left the computer on. Candace also told them that the power strip "was always on." (Def.'s Mot., Ex. C at 2.)

The fire department determined the "cause of the fire is unknown and undetermined, but possibly electrical." (Def.'s Mot., Ex. C at 2.) The fire department then called in Sergeant Bush of the Michigan State Police. Bush "looked through the house," performed an investigation, and stated that "he believed that it was probably electrical but he said that he was going to leave the cause undetermined at this time." (*Id.*)

### C. Investigation to Determine Cause of the Fire

Plaintiff and Defendant dispute the origin and cause of the fire. Each party had two independent experts investigate the fire: a cause and origin expert and an electrical engineering expert. A summary of the four investigations follow.

#### 1. Cause and Origin Experts

Cause and origin experts were retained to determine the exact location in the home that the fire originated and also to subsequently identify the specific cause of the fire.

##### a. Plaintiff: Gary Kraft

Gary Kraft of Herndon & Associates was retained by Plaintiff to investigate the cause and origin of the fire. Kraft concluded "that the fire originat[ed] within the living room, at the northeast corner. Specifically, the origin is identified as the area of the position of the wood roll top desk." (Pl.'s Mot., Ex. 3 at 12.)

> It was the findings of the inspection that there was evidence of fire originating in the area of the north side of the living room. ...

4

This Investigator, after complete examination and inspection of the structure, focused the fire investigation at the north end of the living room, at the northeast corner. It is further identified as the position of the wood roll top desk which housed the computer and components. The area was identified for origin as a result of the destruction to the floor assembly and the side walls destruction. ...

The fire investigation determined that there was fire damage and destruction to the floor at the north end of the desk, within the northeast corner. The fire progressed into the cabinet at the left/north end of the desk, causing destruction to the north panel and the drawer compartment. There is further evidence of exposure/fire damage to the printer and hard drive. ...

The printer had been discovered within the debris of the basement.

The fire investigation within the living room revealed damage and destruction at the north end of the roll top desk and destruction to the computer components, especially the printer. A portion of the service cord was found that included the three prong plug. Also discovered at the remains of the desk were the cords for the hard drive and monitor. ...

The investigation at the desk revealed a monitor with keyboard, hard drive, and printer. The electrical service cords travel to the back of the desk and are plugged into a power strip. The power strip is plugged into the north central duplex/outlet. ...

The investigation also determined, based on visual examination, no evidence of causal factors associated with the side wall electrical service. There further was no specific evidence to indicate causal factors or fault associated with the power strip, computer monitor and hard drive. No determination could be made in regard to the printer.

(Pl.'s Mot., Ex. 3 at 7-9.) Like the fire department, Kraft ultimately concluded that "the cause of the fire is undetermined." (*Id.* at 12.) Although Kraft could not conclusively determine the cause of the fire, his report indicates that he "believe[d] the ignition source [was] associated with electrical fault [and that] [t]he electrical fault may be associated with the Hewlett Packard printer." (*Id.*)

### b. Defendant: Doug McGrew

Doug McGrew of Fire Cause Analysis was retained by Carl Warren & Company to investigate the fire for Defendant. Specifically, McGrew was not asked to identify the cause and origin of the fire, but instead "to evaluate if there was any involvement of the Hewlett-Packard equipment in the fire." (McGrew Dep., Pl.'s Mot., Ex. 2 at 36.) McGrew performed an on-site inspection and was accompanied by one of Defendant's product safety engineers. (*Id.* at 23.) Contrary to Kraft's conclusion as to origin, McGrew "indicated in his report that the fire started in the basement, on the floor below where the adapter was located." (Def.'s Mot., Ex. D at 5.) McGrew also testified that, although he was unable to identify the exact cause of the fire, he was able to eliminate the AC power adapter as a potential cause of the fire. (*Id.* at 36-37.)

### 2. Electrical Engineering Experts

Because neither cause and origin expert was able to conclusively identify the cause of the fire and because Kraft concluded, consistent with the fire department, that the cause was possibly electrical, electrical engineering experts were retained to investigate further.

### a. Plaintiff: Michael McGuire

Based upon Kraft's suspicion that the fire was electrical in nature, Plaintiff retained Michael McGuire to investigate various electrical components, and to specifically investigate whether the printer's AC power adapter failed causing the fire at issue. (McGuire Dep., Def.'s Mot., Ex. E at 24.) McGuire is employed by EFI Global as a Senior Electrical Engineer and Engineering Supervisor. (*Id.* at 7, 11.) EFI's clients are typically insurance companies involved in subrogation actions, and McGuire is responsible for investigating the losses of those clients that require the assistance of an electrical engineer. (*Id.* at 7, 14.)

6

McGuire was provided the evidence[3] that was retrieved from the home and set up a lab examination of the evidence. (*Id.* at 20-21, 24.) At the examination, McGuire "[j]ust examined everything that was recovered from the scene[,]" which included the AC power adapter at issue here. (*Id.* at 21.)

After that examination, McGuire concluded that the cause of the fire was a failure in the printer's AC power adapter, most likely due to an unknown manufacturing defect.[4] McGuire's opinion was based on: (1) a visual inspection of the AC power adapter; (2) the fact that Kraft informed him that the AC power adapter was within the area of origin; (3) that the insulation on the AC power adapter was still intact at the remote ends of each cord; and

_____

[3] This includes, *inter alia*, the evidence Kraft tagged. Kraft tagged the following:
   Evidence #1 is the printer from the living room desk area.
   Evidence #2 is the computer components of monitor and hard drive.
   Evidence #3 is the power strip and all cords.
   The investigation also tagged the electrical items found within the basement debris, that included the recessed light cans and computer cord.
(Pl.'s Mot., Ex. 3 at 12.)

[4] McGuire testified that "[t]he failure mode, as far as I can tell it's the entire power supply heated up. I don't know which specific component caused the heat, but that circuit board heated up sufficiently to start a fire. ... The heat adaptor would have ignited the housing first, and then if it's sitting on the carpet, the carpet and the floor and any other surrounding combustibles." (McGuire Dep., Def.'s Mot., Ex. E at 51.)
   Q: How about a manufacturing defect, can you tell me if it failed as a result of a manufacturing defect?
   A: That would be my opinion, yes.

   Q: And what would be the manufacturing defect that allowed it to fail?
   A: I can't tell in this case specifically what component it was. ...

   Q: So it's your opinion that it is a manufacturing defect, but you can't tell me what the defect is?
   A: Right.
(*Id.* at 55.)

(4) that the AC power adapter was damaged severely enough to completely destroy the housing material. (*Id.* at 24, 32, 42-43.)

> When you find a single device that is the only thing of any really consequential damage, and the damage is much more severe than anything else, I think that's pretty trivial. I think this is about as simple as it gets.

(*Id.* at 42.)

### b. Defendant: Donald Galler

Donald Galler of Electrical Engineering Solutions was retained by Defendant to "participate in the examination of some evidence retained from the fire at the Keinath residence and investigate the possible role of the AC power adapter in the fire." (Galler Dep., Def.'s Mot., Ex. F. at 7; Def.'s Mot., Ex. D. at 2.) Galler explains that

> [a]n electrical engineer's role in a fire investigation is different than the role of a cause and origin investigator. A cause and origin investigator observes fire patterns, considers the structure and ventilation of the structure and conducts interviews to determine the area of origin of the fire. Typically the electrical engineer's role is to review electrical information from the scene to help confirm the area of origin and, in cases where product failures are involved, to determine whether or not a specific product played a role in causing the fire. Several fundamental activities are done to investigate product failures:
>   a. review historical information about specific product failures–such as product recalls.
>   b. examine exemplar products to identify the circuitry, mechanical structure and materials used in the product.
>   c. review the schematics and specifications of the product and its circuitry.
>   d. make calculations regarding possible failure modes.
>   e. review scientific literature about the product or its components.
>   f. perform electrical testing to identify product failure modes.
> 6. These steps are part of a more general process (sometimes called "the scientific method") wherein hypotheses are developed as to potential fire causes (possibly considering several products in the area of origin) and the steps above are done to test and eliminate the various hypotheses until a single likely hypothesis remains.

(Galler Aff., Def.'s Reply, Ex. A at 1-2.)

As part of his investigation, Galler reviewed the reports of McGrew, Kraft, and McGuire,[5] performed an examination of evidence at EFI, reviewed the AC power adapter's schematics and safety certifications, and tested an exemplar AC power adapter. Galler ultimately concluded that the "AC [power] adapter did not start the fire at the Keinath residence." (Def.'s Mot., Ex. D. at 6.)

> My testing and the certification testing indicate that there are numerous safety features[6] in the adapter design, and that even a critical component

---

[5] As to McGuire's report, Galler opined that "[a]lthough Mr. McGuire does a reasonably complete job looking at the evidence that was collected, he does nothing from an electrical engineering standpoint to show that [the AC power adapter] failed or that it is even possible for the adapter to become an ignition source." (Def.'s Mot., Ex. D. at 5.) Galler also opined that:

> 7. Other than forming a hypothesis (apparently just one), Mr. McGuire has failed to perform any of the above mentioned activities (a-f) but instead has relied on a single observation ("Damage on the printer A/C power adapter was by far the most severe") with respect to the A/C power adapter. This observation is not electrical in nature and is usually one the cause and origin investigator, not the electrical engineer, relies upon in analyzing the fire scene. In fact it is not useful from a purely electrical engineering standpoint since any product located near an area of prolonged burning would be heavily damaged.
> 8. Mr. McGuire did not examine an exemplar A/C power adapter or consider the information provided by HP (steps b and c above) in developing his opinions. Had he done so he would have been aware of the construction (for example, the product has 2 fuses and a flame retardant enclosure) and the rigorous safety testing (some of which is essentially the same as the failure mode he proposes–loose connections) that the product has undergone. Using this information Mr. McGuire should have rejected the hypothesis that the A/C power adapter was the cause of the fire.
> 9. Mr. McGuire ... has done no testing, calculations or sited any scientific literature that can be reviewed or repeated by another engineer to verify his conclusions.

(Galler Aff., Def.'s Reply, Ex. A at 2-3.)

[6] According to Galler's deposition testimony:

> The AC adapter has a number of safety features. The first one or principal one of the function features is [an electronic current limiting] that when it is operating and supplying power to the printer, it measures–as it's operating,

9

failure cannot result in a fire. In addition to these safety features the adapter has a flame retardant plastic enclosure which contributes to safety and the ability to pass the numerous safety tests.

Turning now to the physical evidence aspect associated with the adapter, I observed that the AC line fuse was intact.[7] If a failure had occurred it would have resulted in fuse operation, which did not occur. Putting this observation aside and allowing the assumption that a failure of the adapter had occurred to start a fire then we would expect to find electrical activity on the AC power cord of the adapter and no such activity was found. Subsequently we would expect the power strip circuit breaker to be tripped and it was not. These last two conditions (namely arcing on the AC line cord and a tripped power strip breaker) would be expected outcomes of a fire starting near the adapter even from another unrelated cause. The absence of these electrical indicators combined with the fuse condition is inconsistent with a fire caused by an AC adapter failure.

The fact that the printer was not in use at the time the fire started is also generally inconsistent with a fire starting from the adapter as there is very little electrical stress on the components.

A further inconsistency is that there was no electrical activity found an ANY of the electrical material or wiring collected from the fire scene. This is very unusual and suggests that the fire actually started in a completely different area than was identified by EFI and Hendron. Mr. McGrew ... indicated in his report that the fire started in the basement, on the floor below where the adapter was located. This might explain the absence of electrical activity on the collected evidence if the early fire development in the basement attacked electric supply circuits and caused breaker tripping before the fire progressed to the first floor.

---

it measures the output current to the printer.

If there should be some abnormal activity, and the abnormal activity could be a number of things, but let's say there's some abnormal activity and that makes the current level go up beyond to what is normal, then the current limiting feature prevents the current from going any higher than that level.

(Galler Dep., Def.'s Mot., Ex. F. at 22.) The AC power adapter is also equipped with two fuses: an AC fuse and a DC fuse. (*Id.* at 25.) The fuses back up the electronic current limiting feature such that if it does not operate correctly and the current increases, the fuse will "open" (or "blow") and interrupt the current. (*Id.*)

[7] In other words, the fuse did not "blow."

(Def.'s Mot., Ex. D. at 5.) (*Accord* Galler Dep., Def.'s Mot., Ex. F. at 17.)

On May 11, 2009, Plaintiff filed this subrogation action in the United Stated District Court for the Eastern District of Michigan. [Docket Text # 1.] This matter comes before the Court on Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## II.  Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position

will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Analysis

Plaintiff's one-count Complaint alleges "Negligence / Products Liability / Breach of Implied Warranty." (Compl. Count I.) Defendant contends that these claims fail for two reasons. First, Defendant claims that the opinion of Plaintiff's electrical expert, McGuire, must be excluded pursuant to Federal Rule of Evidence 702 as unreliable under the standards set forth by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny. Defendant concludes that because Plaintiff's only evidence that the AC power adapter caused the fire is the opinion of McGuire, and assuming McGuire's opinion does not survive *Daubert* scrutiny, Plaintiff's claims must fail. Alternatively, and even if McGuire's opinion is admissible, Defendant claims that Plaintiff cannot establish that the allegedly defective AC power adapter caused the fire or that the AC power adapter was even defective—both necessary elements of its prima facie case of products liability, negligence and breach of implied warranty. The Court addresses each of Defendant's alternative basis for summary judgment in turn.

### A. McGuire's Opinions are Unreliable and Inadmissable

Courts considering expert testimony examine admissibility within the context of Federal Rule of Evidence 702.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In *Daubert*, the United States Supreme Court held that Rule 702 requires district courts to ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (expanding *Daubert's* analysis of expert scientific testimony to cover expert testimony based on "technical" and "other specialized knowledge"). Thus, Rule 702 imposes a "gatekeeping" duty on district courts, which must exclude unreliable and irrelevant evidence. *See, e.g., Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002).

### 1. Testimony Not Product of Reliable Principles and Methods

First, the Court must determine "whether the experts' testimony reflects 'scientific knowledge,' whether their findings are 'derived by the scientific method,' and whether their work product amounts to 'good science.'" *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, (on remand), 43 F.3d 1311, 1315 (9th Cir. 1995), cert. denied, 516 U.S. 869 (1995) (quoting *Daubert*, 509 U.S. at 590, 593). "An expert opinion that is based on scientifically valid principles will satisfy Fed. R. Evid. 702; an expert's subjective belief or unsupported speculation will not." *Smelser v. Norfolk So. RR Co.*, 105 F.3d 299, 303 (6th Cir.1997), *abrogated on other grounds by Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998) (quoting *Daubert* (on remand), 43 F.3d at 1316). *Id.* Thus, the Court should focus on the expert's methodology rather than the expert's conclusions, but the conclusions must be connected to the existing data by more than the *ipse dixit* of the expert. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.").

13

In its gatekeeping role, the Court is to consider the basis of an expert's opinion by evaluating: (1) whether the theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate and the existence and maintenance of standards controlling the technique's operation; (4) whether it has attracted widespread acceptance in a particular field; and (5) "whether the experts are proposing to testify about matters growing naturally and directly out of the research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying because the former provides important objective proof that the research comports with the dictates of good science." *Smelser*, 105 F.3d at 303.

To evaluate the admissibility of expert testimony, the Court must also consider the purpose for which the testimony is offered. Here, Plaintiff seeks to offer McGuire's testimony to establish that the cause of the fire was a failure in the printer's AC power adapter. McGuire's opinion was based, in part, on a visual inspection of the AC power adapter.

> Q: And what did you do personally? Just can you walk through what you did at the examination?
> A: Just examined everything that was recovered from the scene. ...
>
> Q: And did you take x-rays?
> A: Yes. ...
>
> Q: ... Was there anything significant that you saw or found in the x-rays that were taken?
> A: No. You could see it with the naked eye. I don't even know why we took the x-rays. There was nothing to see. ...
>
> Q: And the review of the x-rays taken ..., I think you told me those are fairly insignificant?
> A: Yeah. I don't think they show anything that the photographs don't show.

> Q: So there is nothing–can you see any–I'll says this for lack of a better term–any failures of the equipment through the x-rays?
> A: No. I don't think it uncovered anything, anything new.

(McGuire Dep., Def.'s Mot., Ex. E at 21, 33.) McGuire's opinion was also conditioned on the fact that Kraft informed him that the AC power adapter was within the area of origin.

> Q: What did you and Mr. Kraft talk about?
> A: He just told me he had a fire that started and the [AC power adapter] was the origin and that's pretty much it. And we were going to set up a lab exam.
>
> Q: Did he provide you with any thought, comments, theories?
> A: He may have, but that was a while ago.
>
> Q: Anything that sticks in your mind?
> A: Just the fact that he believed that the fire started at that [AC power adapter]. ...
>
> Q: And I think you said before your discussion with Mr. Kraft was that he believed the origin was a certain spot and the power supply was at the origin?
> A: Right. ...
>
> Q: Under 6.2, which is your analysis, you say here: More importantly, Mr. Kraft determined that the fire originated in the area of the computer system not near the ceiling. Is that based on your verbal conversations with Mr. Kraft?
> A: Right. ...

(McGuire Dep., Def.'s Mot., Ex. E at 24, 32, 36.) (*See also id.* at 32 ("Q: ... The basis for conclusions [sic] are lab examination ..., discussion with ... Kraft ..., and review of x-rays taken ... A: Yes.").)

McGuire ultimately concluded that, based on the localized nature of the damage to the AC power adapter, some defect must have occurred and resulted in a fire.

> A: Right. It shows the localized nature of the damage.
>
> Q: Did you rely on–do you have any published or peer reviewed materials that you relied on to make that statement?

A: Well, I think you can look at anywhere. You can show that when you have localized damage on a piece of equipment that that's more likely to be an origin as opposed to the result of a fire, because the fire can't attack an individual piece of equipment like that. I just doesn't happen. ...

Q: That evidence clearly indicates that the fire originated at the [AC power adapter] ... ?
A: I think if you look at any piece of equipment, if you look at localized damage, you can look at any document written by someone that's investigated fires, when you have minor damage, the area with the heavy damage is going to be your cause. I think that's pretty trivial. ...

Q: Can you tell me or point to any peer review or any literature to support that opinion?
A: Yes, it's the same thing. When you find a single device that is the only thing of any really consequential damage, and the damage is much more severe than anything else, I think that's pretty trivial. I think this is about as simple as it gets. ...

Q: What is it then about the condition of the adaptor portion, the power strip that you found, that tells you it was the cause?
A: Again, if you're talking about power supply, the localized damage, the localized damage is not feasible from a fire that started elsewhere. It simply isn't feasible. ...

(McGuire Dep., Def.'s Mot., Ex. E at 38-39, 41-42, 50.)

Defendant claims—assuming *arguendo* McGuire is qualified to offer opinion testimony—his opinion here is unreliable and should not be admitted to support Plaintiff's claims. Specifically, Defendant contends that McGuire's opinions are not the product of reliable principles and methods because he failed to test any of his theories and because he did not offer any theory that has been subjected to peer review and publication, has a known or potential error rate, or is generally accepted in the engineering community.

"*Daubert* teaches that expert opinion testimony qualifies ... under Rule 702 only if it is derived by the scientific method and is capable of validation." *Smelser*, 105 F.3d at 304. McGuire's opinion—that the cause of the fire was a failure in the printer's AC power

16

adapter—cannot be considered "reliable" when he: (1) failed to perform any testing, rely upon any principles that have been tested concerning the AC power adapter's alleged failure,[8] (*id.* at 10, 23, 29, 51-52), or perform a comparative analysis (*id.* at 28, 52); (2) failed to subject his theories to peer review,[9] (*id.* at 10, 52-53), or consult any published materials prior to or after the examination, (*id.* at 23); (3) failed to provide any empirical testing information concerning his theories' rates of error and has not offered evidence that shows whether or how often his proffered opinion is based upon methods that may produce false results,[10] (*id.* at 53); and (4) failed to identify any level of general acceptance

---

[8] "[A] key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (or has been) tested. Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert*, 509 U.S. at 593. As stated in the advisory committee notes to Rule 702, whether the expert's theory has been or can be tested means whether the theory "can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability." Committee Notes on Rules, 2000 Amendments.

  Plaintiff has presented no evidence that McGuire's opinion is based upon well established and tested concepts generally applicable to electrical engineering. *See, e.g., Cook v. American Steamship Co.*, 53 F.3d 733, 739 (6th Cir. 1995), *overruled on other grounds by General Electric v. Joiner*, 522 U.S. 136 (1997) (holding that it was error for the trail court to allow an expert to speculate that a marine rope had failed from exposure to a torch when the only "test" that was conducted was "to visually examine the frayed end of the line with the naked eye and under a low power microscope." In particular, the Sixth Circuit concluded that the expert's causation opinion was not based upon science even though it was "adorned ... in the dress of scientific or technical expertise.")

[9] Although not dispositive, peer review and publication by the scientific community "increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593.

[10] "[T]he court ordinarily should consider the known or potential rate of error ... and the existence and maintenance of standards controlling the technique's operation." *Daubert*, 509 U.S. at 594.

applicable to his methodologies,[11] (*id.* at 54).[12] McGuire's attempt to prove his hypothesis—that an unknown manufacturing defect in the AC adapter caused the fire—solely on the occurrence of the fire, the reported area of origin, and a visual inspection of the AC power adapter does not withstand *Daubert* scrutiny.[13]

---

[11] "Finally, general acceptance can yet have a bearing on the inquiry. A reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community. Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594 (internal quotations and citations omitted).

[12] Although not necessary to reach a determination as to admissibility under *Daubert*, the Court also notes that McGuire: (1) failed to provide any possible explanation for the alleged failure of the AC power adapter, (*supra*, fn.4); (2) failed to adequately examine the AC power adapter including his failure to determine whether the AC fuse had "blown", (McGuire Dep., Def.'s Mot., Ex. E at 46-47); (3) failed to research the AC power adapter including reviewing the product's component materials or their properties, wiring schematic, safety features, applicable CB/UL testing information, or other technical charts and materials (*id.* at 46-49); (4) failed to examine the scene or speak to any witnesses (*id.* at 23-24, 56); and (5) failed to perform a destructive analysis of the AC power adapter. These facts, in addition to the fact that the cases address the admissibility of cause and origin experts not electrical engineer experts, distinguish the authority Plaintiff relies upon to support the admissibility of McGuire's opinion. *See, e.g., George v. Ronco Inventions, LLC*, No. 02-1436, 2004 WL 546898 (D. Kan. Mar. 2, 2004); *Savage v. Scripto-Tokai Corp.*, 266 F.Supp.2d 344 (D. Conn. 2003).

McGuire did, however, attempt to eliminate some other potential causes in the area of origin identified by Kraft. (*See, e.g.,* McGuire Dep., Def.'s Mot., Ex. E at 33 (eliminating the surge suppressor as a possible cause).) And, besides from the visual examination and the x-ray, McGuire also took measurements of the circuit board and the power cord. (*Id.* at 35.)

[13] Moreover, McGuire acknowledged that if the origin of the fire was actually somewhere else in the home then his opinion may differ.

Q: If Mr. Kraft was wrong and the origin was not where he thought it was, would that change your opinions in this case?
A: It could.

(McGuire Dep., Def.'s Mot., Ex. E at 37.)

Q: So if the origin–I think we said this before, if the origin was actually somewhere else, then your opinion then could differ?

Although McGuire developed a general hypothesis—that the AC power adapter caused the fire—he failed to show that the AC power adapter could have failed or even had the capability of causing such a fire. McGuire's conclusions are not based upon reliable principles and methods, but instead are based primarily upon his "real world experience." (Pl.'s Resp. at 10.)

Plaintiff contends that "[f]ire cases are unique to the extent that the defect in the product which results in the fire, does not, in many cases survive the calamity it produced." (Pl.'s Resp. at 8.) Plaintiff offers the following in support:

> [n]ot every event is capable of replication, nor does every opinion in a fire case require a peer review ..., the purported impossibility of an event does not always reflect what occurs in the real world. In that regard Mike McGuire has prepared an affidavit setting forth his real world experience and the basis for his conclusion, to rebut the esoteric arguments, that his opinions are not valid or subject to peer review because he failed to try to recreate a scenario which may repeat itself in less than one in 100,000 cases.

(*Id.* at 10.) The Court is not persuaded by Plaintiff's contention. *See, e.g., Chester Valley Coach Works, Inc. v. Fisher-Price*, No. 99-4197, 2001 WL 1160012, at *3 (E.D. Pa. Aug. 29, 2001) (holding that an expert's opinion "as to fire origin and causation [that was] not based on any testing, experimentation, or generally accepted texts, treatises, or other writing" and was instead "based primarily upon his 'experience and education'" was not supported by valid and reliable methodology and was, thus, inadmissible.)[14] Moreover, the

---

A: Yes.
(*Id.* at 58.)

[14] The *Chester* court, in part, relied on *Oddi v. Ford Motor Co.*, 234 F.3d 136 (3rd Cir. 2000) which affirmed a district court's exclusion of expert testimony as to the cause of an automobile accident based upon *Daubert*. In affirming, the court placed great emphasis on the fact that plaintiff's expert never tested his theory on causation nor did he perform any separate tests or experimentation to support his conclusions. The *Oddi* court stated:

party seeking to have the testimony admitted bears the burden of showing "that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology" and "the expert's bald assurance of validity is not enough." *Daubert* (on remand), 43 F.3d at 1316. Here, McGuire's affidavit attempting to support his prior opinion is simply insufficient.

Plaintiff has not met its burden here: it has failed to establish that McGuire's opinion was based on scientifically valid principles, was repeatable, had been the subject of peer review or publication or was a generally accepted method for determining that a manufacturing defect in an electrical component caused a fire.[15] Plaintiff, therefore, has

---

> Essentially [the expert's] opinion ... is based on nothing more than his training and years of experience as an engineer. Although there may be some circumstances where one's training and experience will provide an adequate foundation to admit an opinion and furnish the necessary reliability to allow a jury to consider it, this is not such a case ... [The expert's] *ipse dixit* does not withstand *Daubert's* scrutiny.

*Oddi*, 234 F.3d at 158. The *Chester* court also relied on *Booth v. Black & Decker*, No. 98-6352, 2001 WL 366631 (E.D. Pa. Apr. 12, 2001), which granted summary judgment to the defendant on plaintiff's negligence, design defect, and breach of warranty claims stemming from a house fire allegedly caused by a Black & Decker toaster oven. The court granted summary judgment only after concluding that the plaintiff's causation expert's testimony must be excluded pursuant to *Daubert*. In doing so, the *Booth* court noted:

> [The expert] asserted that his method of investigating the cause of the fire was a standard method applied by others in the field, but he produced no persuasive, objective evidence that his method was subject to peer review, had a known or potential rate of error, could be measured against existing standards, or was generally accepted, as required by Rule 702, *Daubert*, *Kumho Tire*, and *Oddi*.

*Booth*, 2001 WL 3666361, at *12.

[15] *See, e.g., Istvan v. Honda Motor Co., Ltd.*, No. 08-12507, 2010 WL 1254844, at *5 (E.D. Mich. Mar. 25, 2010)

> [I]n reaching his conclusion, Mr. Gregorio did not examine the accident motorcycle, nor review the two thousand (2,000) plus pages of testing documents concerning motorcycle handling, stability, and running tests provided to him by Defendants, while conceding that review of such materials

failed to establish that McGuire's opinion represents reliable principles and methods. Accordingly, McGuire's opinion that the AC power adapter was defective and caused the fire would be inadmissible at trial.

### 2. Testimony Will Not Assist the Trier of Fact

Second, the Court must determine the relevancy of the proposed testimony. Expert testimony is relevant only when it will assist the trier of fact in understanding the evidence or determining a material fact in question. *Daubert*, 509 U.S. at 592-93. Again, the party offering expert testimony must prove its admissibility by a preponderance of the evidence. *Id.* at 592 n.10.

> Although the inquiry under Fed. R. Evid. 702 is whether expert testimony will help the jury understand the evidence or determine a fact in issue, many courts have formulated the question as whether expert testimony improperly addresses matters *within the understanding or common knowledge of the average juror* or invades the province of jury.

*United States v. Thomas*, 74 F.3d 676, 684 n.6 (6th Cir. 1996), *abrogated on other grounds by Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998) (emphasis added). *See also Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) ("If everyone knows [a particular fact], then we do not need an expert because the testimony will not assist the trier of fact to understand the evidence or to determine a fact in issue.") (internal citation omitted).

_____

> would be a reasonable expectation of anyone reaching a conclusion as to a design defect. Mr. Gregorio's theory that a high speed wobble can occur at speeds of sixty-five (65) to seventy-five (75) mph has not been subjected to any peer review, and is in direct contradiction to Mr. Kopernik's testimony that high speed wobble does not occur at such speeds. Based on all of the above, the Court concludes that Mr. Gregorio's testimony is unreliable and therefore inadmissible under *Daubert*.

*Id.*

For example, in *Cook*, the Sixth Circuit reversed the district court's decision to admit expert testimony because the expert's only testing involved a visual examination of "the line at the place where it parted and observed some char marks on some of the fibers; that much the jurors could have done, and presumably did do." *Cook*, 53 F.3d at 739. Such "was not scientific, technical, or other specialized knowledge based upon testing conducted, as *Daubert* requires, in accordance with valid scientific methodology in order to permit [the expert] to draw inferences that are beyond the 'ken' of lay jurors." *Id.* (internal quotations omitted).

> [The expert's] causation opinion, adorned as it was in the dress of scientific or technical expertise and fortified by the court's later instruction to the jury calling it "expert opinion," was not expert testimony under Rule 702. It is precisely this kind of testimony that the Supreme Court in *Daubert* admonished federal courts to screen for scientific validity as a part of the courts' "gatekeeping function."

*Id.* Here, McGuire's visual examination and conclusion that the "damage [on the AC power adapter was] much more severe than anything else," is certainly a matter "within the understanding or common knowledge of the average juror" and "invades the province of jury." McGuire's opinion—based on personal conjecture and speculation—will confuse and mislead, rather than assist, the trier of fact.

## B. Prima Facie Case of Products Liability

Plaintiff seeks to hold Defendant liable for the loss it sustained alleging claims of "Negligence / Products Liability / Breach of Implied Warranty" under the theory of products liability. In Michigan, a product liability action is defined as "an action based on a legal or equitable theory of liability brought for ... damage to property caused by or resulting from the production of a product." Mich Comp. Laws § 600.2945(h). "Traditional principles of

products liability law recognize three types of defects: manufacturing defects, defects due to faulty design, and defects due to inadequate instructions or warnings." *Fleck v. Titan Tire Corp.*, 177 F.Supp.2d 605, 613 (E.D. Mich. 2001) (citing Rest. 3d of Torts § 2 (1998)).

In order "[t]o provide compensation for injuries caused by such defects, Michigan recognizes two distinct causes of action for product failures: negligence and implied warranty." *Id.* (citing *Gregory v. Cincinnati, Inc.*, 538 N.W.2d 325, 329 (Mich. 1995); *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 736-37 (6th Cir. 2000)). The "negligence theory generally focuses on the defendant's conduct, requiring a showing that it was unreasonable," whereas the implied warranty cause of action "generally focuses upon the fitness of the product, irrespective of the defendant's conduct." *Prentis v. Yale Mfg. Co.*, 365 N.W.2d 176, 186 (Mich. 1985).

> These theories are not always mutually exclusive. When used to attack design and warning defects, the two theories may effectively require the same elements and proofs. As a result, in design defect cases against a manufacturer, only a negligence cause of action is cognizable. Nonetheless, the two causes of action remain separate theories with distinct elements.

*Sundberg v. Keller Ladder*, No. 00-10117, 2001 WL 1397290, at *5 (E.D. Mich. Nov. 8, 2001). Plaintiff's Complaint, though inartfully drafted, appears to assert a manufacturing defect claim under a negligence theory and also a breach of implied warranty claim.[16]

---

[16] To the extent that Plaintiff also alleges a claim of negligent design of the product (design defect), this Court rejects for the reasons discussed below (i.e., Plaintiff has not established a "demonstrable malfunction" with the product nor has Plaintiff demonstrated the requisite causation between the alleged defect and the injury). Additionally, Plaintiff has provided no evidence that a "feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users." Mich. Comp. Laws § 600.2946(2). Its own expert, McGuire, testified that:

Q: Can you tell me if the power adapter failed as a result of a design defect?
A: No. I can't tell you that.

The negligence cause of action recognizes that manufacturers have a duty to use reasonable care to produce a product that is reasonably safe for its intended, anticipated, or reasonably foreseeable use. *Prentis*, 365 N.W.2d at 187. To establish a manufacturing defect, the plaintiff must show that: (1) the product was defectively manufactured; (2) the product reached the plaintiff in the same condition as it was when it left the manufacturer; and (3) the defect was the proximate cause of the plaintiff's damages. *See Allstate Ins. Co. v. Icon Health & Fitness, Inc.*, 361 F.Supp.2d 673, 677 (E.D. Mich. 2005) (citing *Prentis*, 365 N.W.2d 176). On the other hand, a breach of implied warranty claim focuses on the condition of the product, and "[c]ustomarily, [a] defect can be found regardless of the amount of care utilized by the manufacturer." *Gregory*, 538 N.W.2d at 329 (internal quotation and citation omitted). To establish an implied warranty claim, the plaintiff must show: (1) a defect attributable to the manufacturer; (2) when the product left the manufacturer; and (3) that the defect caused the plaintiff's injury. *See Allstate Ins. Co.*, 361 F.Supp.2d at 677 (internal quotation and citations omitted).

> The distinction between the elements of negligence and breach of implied warranty in a products liability action is that in the former the plaintiff must prove that the defect was caused by the manufacturer's negligence, whereas under the implied warranty theory the plaintiff need only establish that the defect was attributable to the manufacturer, regardless of the amount of care utilized by the manufacturer.

20 Mich. Civ. Jur. Products Liability § 4 (2010).

---

Q: Are you going to offer testimony that this power adapter was defectively designed?
A: No.
(McGuire Dep., Def.'s Mot., Ex. E at 55.)

Regardless of whether a plaintiff is proceeding under a negligence theory or a breach of implied warranty theory the plaintiff must, at a minimum, establish: (1) that the product was defective; (2) that the product was defective when it left the control of the defendant; and (3) that the defective product caused the plaintiff's injuries. *See Kupkowski v. Avis Ford, Inc.*, 235 N.W.2d 324, 328 (Mich. 1975) (holding "that in order to establish a Prima [sic] facie case of negligence or breach of warranty in products liability cases, plaintiffs who seek to avoid a directed verdict must prove a defect attributable to the manufacturer (or seller) and causal connection between that defect and the injury or damage of which he complains") (internal quotation and citation omitted). Because the Court finds that Plaintiff has not met its burden on any of these elements, Defendant's motion for summary judgment is granted. The Court first addresses causation, followed by the issue of defectiveness.

### a. Causation

In order to establish causation, Plaintiff must prove that the defective product caused the injury—that the allegedly defective AC power adapter caused the fire. McGuire is Plaintiff's only expert witness who definitively opined as to causation. Other than McGuire's opinion, Plaintiff lacks any competent evidence that the AC power adapter malfunctioned or failed causing the fire. Because McGuire's testimony is inadmissible under Fed. R. Evid. 702 and *Daubert*, Plaintiff has no evidence to establish causation and its claims fail. As there is no genuine issue of material fact on the issue of causation, the Court grants summary judgment in favor of Defendant.

Notwithstanding that determination, Defendant claims that—even if the Court were to consider McGuire's opinion—Plaintiff still cannot establish a prima facie case of products

liability. Specifically, Defendant argues that Plaintiff has no evidence of causation beyond the mere conjecture and speculation of McGuire's opinion and, therefore, cannot establish the requisite causation and cannot survive summary judgment.[17]

"It is well settled under Michigan law that a prima facie case for products liability requires proof of a causal connection between an established defect and injury." *Skinner v. Square D Co.*, 516 N.W.2d 475, 478 (1994). Thus, to establish a prima facie case of products liability, the plaintiff must show "that the defendant supplied a product that was defective and that the defect caused the injury." *Auto Club Ins. Ass'n v. General Motors Corp.*, 552 N.W.2d 523, 604 (Mich. 1996) (internal citations omitted).

> While the plaintiff bears the burden of proof, the plaintiff is not required to produce evidence that positively eliminates every other potential cause. Rather, the plaintiff's evidence is sufficient if it establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support.

*Skinner*, 516 N.W.2d at 478. "While plaintiffs may show causation circumstantially, the mere happening of an unwitnessed mishap neither eliminates nor reduces a plaintiff's duty to effectively demonstrate causation." *Id.* Thus, "causation theories that are mere possibilities or, at most, equally as probable as other theories" are simply insufficient. *Id.* at 484. "To be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation"; "the plaintiff must present *substantial*

---

[17] Under Rule 56, the party opposing a motion for summary judgment "may not rely merely on allegations ... in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. If the disputed evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

*evidence* from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Id.* at 480 (emphasis added). And, where an expert opinion is used to establish causation such an "opinion must be supported by 'more than subjective belief and unsupported speculation' and should be supported by 'good grounds,' based on what is known." *Pomella v. Regency Coach Lines, Ltd.*, 899 F.Supp. 335, 342 (E.D. Mich. 1995) (quoting *Daubert*, 509 U.S. at 590 (1993)). Thus, the expert's conclusions regarding causation must have a basis in established fact and cannot be "premised on mere suppositions." *Skinner*, 516 N.W.2d at 484.

As to both theories of liability—negligent manufacturing and breach of implied warranty—Plaintiff has not presented substantial evidence of causation. Plaintiff's only evidence to establish a causal connection between the fire and the AC power adapter is the opinion of McGuire. And, as discusses above, McGuire's opinion is based on his subjective belief following a visual examination of the AC power adapter: it amounts to little more than "mere suppositions." Notwithstanding this Court's determination that McGuire's opinion is inadmissable, his opinion is also insufficient to establish a causal link between an alleged defect in the AC power adapter and the fire.[18] In viewing the evidence in the light

_____

[18] *See, e.g., Pioneer State Mutual Ins. Co. v. Moran Oldsmobile-Cadillac-GMC Truck, Inc.*, No. 249713, 251382, 2005 WL 995042, at *1 (Mich. Ct. App. Apr. 28, 2005)

> [The plaintiff] hired an investigator, Daniel Terski, to investigate the fire. Terski concluded that the fire began in the car's engine compartment, but could not say what caused the fire. [The plaintiff] then hired electrical engineer Michael McGuire to investigate the accident further. McGuire reviewed Terski's report and conducted his own examination of the car's engine compartment, and concluded that an electrical failure in the engine compartment was the cause of the fire. ...

> McGuire ... performed no objective scientific or technical testing that would link any conduct of [the defendant] to the fire. McGuire's conclusion is

most favorable to Plaintiff, the Court finds that Plaintiff has not sufficiently established

causation. Accordingly, summary judgment is granted on this alternate ground.

### b. Defectiveness

In *Prentis*, the Michigan Supreme Court elaborated on the meaning of the word

defective in the products liability context:

> [l]ike the courts in every other state, whether a suit is based upon negligence or implied warranty, we require the plaintiff to prove that the product itself is actionable-that something is wrong with it that makes it dangerous. This idea of "something wrong" is usually expressed by the adjective "defective" ... As

---

> essentially a "hunch," made on the basis of the evidence he found of an electrical failure, combined with the proximity in time of the fire to some significant repair work [the defendant] had completed on the car. The trial court concluded that the evidence presented by [the plaintiff] was simply too speculative, and that, as a result, summary disposition was appropriate. We agree with the trial court, and hold that it properly granted summary disposition in favor of [the defendant]. ...
>
> [T]he trial court stated: "The opinion of plaintiff's expert in this case fails to rise above mere speculation and conjecture. Perhaps the technician might have been able to see a defect or hazard when the connector was reconnected, or perhaps he might not have been. Perhaps that was the cause of the fire, perhaps it was not.... Under these facts, it would be inappropriate to submit this case to a jury."

*Id.*; *Istvan*, 2010 WL 1254844, at *5

> As to both theories of liability, design defect and breach of implied warranty, Plaintiff cannot establish the causation element with sufficient evidence. Plaintiff has presented insufficient evidence on this issue. The only person witnessing the accident was Mr. O'Neill, who can only testify as to what he witnessed once the motorcycle was already in an unstable condition. Mr. Gregorio identified a host of factors that could have caused this condition. The jury will be left to decide what caused Mr. Istvan's accident with equally supportable theories. It is insufficient to submit a causation theory that, while factually supported, is, at best, just as possible as another theory." In this matter, there is an absence of sufficient circumstantial evidence that explains why Mr. Istvan lost control of his motorcycle. Therefore, Defendants' Motion for Summary Judgment is granted.

*Id.* (internal citations and quotations omitted).

a term of art, "defective" gives little difficulty when something goes wrong in the manufacturing process and the product is not in its intended condition.

*Prentis*, 365 N.W.2d at 181-82. "[I]t is the injury inflicted on the plaintiff that entitles him to a remedy, not his skill in discovering precisely where defendant's manufacturing process went wrong." *Holloway v. General Motors Corp.*, 271 N.W.2d 777, 783 (Mich. 1978). Thus, the *Holloway* court concluded that a person injured by a product need not identify the specific defect. *See id.* Indeed, "[a] demonstrable malfunction is generally clear evidence of a defect." *Kenkel*, 665 N.W.2d at 497 (internal quotation and citation omitted).

Defendant claims that, even if McGuire's testimony is accepted, Plaintiff cannot establish that the AC power adapter was defective. Indeed, Plaintiff's expert admits that he cannot point to a manufacturing defect with the AC power adapter. McGuire testified that "[t]he failure mode, as far as I can tell it's the entire power supply heated up. I don't know which specific component caused the heat, but that circuit board heated up sufficiently to start a fire. ... The heat adaptor would have ignited the housing first, and then if it's sitting on the carpet, the carpet and the floor and any other surrounding combustibles." (McGuire Dep., Def.'s Mot., Ex. E at 51.)

> Q: How about a manufacturing defect, can you tell me if it failed as a result of a manufacturing defect?
> A: That would be my opinion, yes.
>
> Q: And what would be the manufacturing defect that allowed it to fail?
> A: I can't tell in this case specifically what component it was. ...
>
> Q: So it's your opinion that it is a manufacturing defect, but you can't tell me what the defect is?
> A: Right.

(*Id.* at 55.) As discussed above, such an opinion is conjecture and speculation, and it does not tend to show a "demonstrable malfunction." Although Plaintiff need not pinpoint a

specific defect, Plaintiff must provide more than "mere supposition" to establish that something with the AC adapter went wrong consistent with a defect. *See Sundberg*, 2001 WL 1397290, at *6 (holding that "the mere showing that something went wrong consistent with the existence of a defect is sufficient ... As a result, the plaintiff need only demonstrate a logical sequence of cause and effect between the alleged defect and the injury") (internal citations omitted). Here, Plaintiff has not shown that the AC power adapter failed, let alone that "something was wrong with it that makes it dangerous." *Prentis*, 364 N.W.2d at 181-82. Viewing the evidence in a light most favorable to Plaintiff, the Court finds that Plaintiff lacks sufficient evidence to establish that the AC adapter was defective.[19] Accordingly, the Court grants summary judgment on this alternate ground.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: May 13, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on May 13, 2010, by electronic and/or ordinary mail.


s/Carol A. Hemeyer
Case Manager

---

[19] Because this Court has concluded that Plaintiff has not demonstrated that the product was defective, there is no need to address whether the product was defective when it left the control of Defendant.